

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | DIVISION ONE |
| ) | |
| Appellant, ) | No. 69655-6-I |
| ) | |
| v. ) | UNPUBLISHED OPINION |
| ) | |
| CHRISTAPHER TARENCE WHITE, ) | |
| ) | |
| Respondent. ) | FILED: November 10, 2014 |
| ) | |

DWYER, J. — Following a jury trial, Christapher White was convicted of one count of assault in the second degree, two counts of rape in the second degree, and one count of unlawful imprisonment. On appeal, he contends that (1) the information was defective because it omitted essential elements of the crime of unlawful imprisonment, (2) the jury instruction defining recklessness misstated the law and relieved the State of its burden to prove each element of assault in the second degree beyond a reasonable doubt or, in the alternative, his counsel provided ineffective assistance by failing to object to the instruction, (3) the trial court erred when it admitted evidence that police found two ski masks in the home where the charged crimes occurred, (4) the court miscalculated White's offender score for his assault conviction, and (5) the term of community custody imposed for the assault conviction is not authorized by statute. In a statement of additional grounds, White also contends that he was mentally incompetent at trial

and that defense counsel provided ineffective assistance by failing to obtain a mental health evaluation of White before trial.

We find no error concerning the challenge to the information, the jury instructions, or the admission of evidence. Moreover, the record does not support White's mental incompetence and related ineffective assistance claims. However, the trial court did err in calculating the offender score and imposing community custody. Thus, we affirm the convictions but remand to the trial court for further proceedings as specified herein.

I

In January 2010, Troy O'Dell, Candice Sanders (O'Dell's girl friend), and Luis Perez (White's co-defendant) were living together in a house in the Burien area. White had been staying there for a couple of weeks. E.C. (the victim) had also been staying there for about a month.[1]

While at their house, E.C. spent a significant amount of time caring for the two young children of O'Dell and Sanders. O'Dell and Sanders were otherwise occupied—O'Dell pursuing his music career and Sanders misusing prescription drugs. Tension arose between E.C. and Sanders because of Sanders's drug use. Sanders found out that E.C. told O'Dell's sister that Sanders was using drugs in front of the children, which led to further tension between them.

Two or three days before the events in question occurred, E.C. left the house because she was "fed up" with babysitting the children and arguing with

---

[1] E.C. is O'Dell's older sister's best friend. Although they are not related, E.C. considered O'Dell to be her little brother, and they referred to each other as "brother" and "sister." E.C. thought of White and Perez as family as well.

Sanders. During those two or three days, E.C. stayed in a series of motels and went on a crack cocaine binge.

Despite her problems with Sanders, E.C. returned to O'Dell's house seeking to get some rest. Upon E.C.'s arrival at the house, O'Dell told her that she and Sanders were going to fight each other because E.C. was "talking mess" about Sanders. E.C. thought that if she fought with Sanders the issue would be resolved, so she agreed.

E.C. and Sanders then began fighting. When E.C. and Sanders stopped fighting, White stepped in and punched E.C. in the face with such force that she fell to the floor and lost consciousness. When E.C. regained consciousness and got up on her knees, Perez punched her in the face. Sanders tried to light E.C.'s hair on fire with a cigarette lighter. E.C. was moaning and crying. O'Dell told her that she was "going to die."

After White punched E.C. a second time, Sanders told White and Perez to stop hitting E.C. E.C. was bleeding heavily from being repeatedly punched in the face. There was blood on the wall by the door and on the carpet where she had fallen. E.C. tried to stand up but stumbled. As she struggled, White yelled at her. Perez and Sanders laughed at her. O'Dell told White and Perez to take E.C. downstairs and "get her cleaned up." White and Perez then helped E.C. down the stairs. E.C. thought the incident was over at that point.

White and Perez gave E.C. some clean clothes and told her to change out of her bloodstained clothes. E.C. tried to shut the bathroom door for privacy, but she was prevented from doing so by White and Perez, who forced her to change

in front of them. Perez took E.C.'s bloody clothing and put it in the washing machine.

After E.C. changed clothes, White and Perez led her to Perez's room, which was also located downstairs. E.C. thought that they were going to allow her to sleep. Instead, White and Perez told E.C. that O'Dell had told them to kill her. White said, "If you let us fuck you, then we will not kill you." When E.C. told them that she was menstruating, White said, "Well, we'll- we'll fuck you in the ass." E.C. told them she had HIV[2] in an attempt to dissuade them from raping her. When that failed, she begged them to at least wear condoms. They agreed.

White and Perez took turns anally raping E.C. for about 15 to 20 minutes. Each man also put his penis in E.C.'s face and told her to "suck it" while laughing at her. E.C. did not resist being raped by the defendants because she believed, based on their threats, that they would kill her if she did not acquiesce. E.C. had seen both White and Perez in possession of firearms in the past and she knew that there were guns in Perez's room "all the time."

After raping E.C., White and Perez refused to allow her to leave Perez's room. White slept there with E.C. on a couch. He took the outside of the couch so that E.C. could not get up without him knowing. At least one of the men would follow E.C. when she got up to go to the bathroom. White and Perez warned E.C. not to leave the house. She believed that they would kill her if she tried to leave.

The next morning, while O'Dell, Sanders, White, and Perez were upstairs

---

[2] Human immunodeficiency virus.

in the living room watching television together, White stated, "We fucked her." At that point, Sanders realized that all of them "were in a lot of trouble" and "going to go to jail for a long time." At some point that day, Sanders went downstairs and gave E.C. some food and a cigarette. Sanders told E.C. that she would not let E.C. leave to go to the hospital, because E.C. would "probably bring the police to [Sander's] house."

E.C. finally made her escape a day or so later, when everyone, except for a business associate of O'Dell's, had left the house. E.C. ran to Milton Chatman's house, which was about a block away from O'Dell's. Chatman's wife, Karen Santos, saw that E.C. was obviously injured and invited her inside. When Chatman came home, he saw that E.C. was crying and "all beat up." E.C. told him that she had been raped and held against her will at her "brother's" house. Chatman drove E.C. to Highline Hospital because she was in pain and "very injured."

E.C. told nurse Christine Hoolboom, who treated her at Highline, that she was beaten and raped by two men, but she refused to say where it happened. E.C. was "afraid she would get hurt if she gave a lot of information," and she did not want to call the police. E.C. told Dr. Lance Young, who also treated her at Highline, that she was assaulted by two men and a woman, and that she was anally raped by two men. E.C. also told Dr. Young that she did not want to be transferred to Harborview Medical Center "because she was concerned that the people who did this to her might . . . find her there," and that they would "show up at the hospital and execute her with handguns."

- 5 -

E.C.'s CT scan revealed a blowout fracture of the orbital bone on the left side of her face. Despite E.C.'s reluctance, she was transferred to Harborview for treatment of her injuries and for a sexual assault examination. E.C. told Harborview social worker Joanne Veneziano that she was afraid that her assailants would kill her because she was reporting the crime. In spite of these fears, E.C. eventually told Veneziano that she was physically assaulted by Sanders, White, and Perez, and that White and Perez had anally raped her.

Deputy Gerald Meyer of the King County Sheriff's Office was the first police officer to contact E.C. at Harborview. Meyer was "stunned" and "taken aback" by the amount of swelling on her face. Meyer took a brief statement from E.C. and, with E.C.'s help, drew a diagram of O'Dell's house in order to assist detectives in obtaining a search warrant. E.C. told Meyer that she was afraid to talk about "snitching" because she believed that "she would be killed." Detective Marylisa Priebe-Olson then spoke with Meyer and took a recorded statement from E.C. Afterward, Priebe-Olson directed other officers to arrest O'Dell, Sanders, White, and Perez.

After all four suspects had been arrested, they were interviewed and processed. During their initial interviews, O'Dell and Sanders both claimed that E.C. was already injured when she arrived at their house, and that they would not allow her to enter because she was drunk.[3] White and Perez also claimed that E.C. had not been inside the house. They denied assaulting E.C. However, the

---

[3] Eventually, O'Dell and Sanders entered plea agreements with the State, and they both testified against White and Perez at trial.

detectives noticed that Perez's right hand knuckles were obviously swollen. White and Perez also denied having intercourse with E.C.[4]

O'Dell's house was searched pursuant to a search warrant. Among other items of evidence, the police found a gun case, ammunition magazines, ammunition, and ski masks.[5] These items were found downstairs—where White and Perez raped E.C. and held her against her will. One condom wrapper was found in Perez's room, and two other condom wrappers were found in a bag of wet clothing nearby.

The State charged White and Perez with one count of assault in the second degree, two counts of rape in the first degree, two counts of rape in the second degree (in the alternative), and one count of unlawful imprisonment—all based on a series of acts committed against E.C. between January 20 and January 22, 2010. Perez was also charged with possession of a controlled substance (oxycodone).[6]

A jury trial on the assault, rape, and unlawful imprisonment charges was held in November and December of 2011. At trial, Perez repudiated his earlier statements given during interviews with the police, testifying that he had lied because he was afraid of O'Dell. Perez denied raping E.C. and claimed that O'Dell was the one who had assaulted E.C. Perez also testified that when he told the police that he had consensual anal sex with E.C. during his second

---

[4] Perez's story later changed. After failing a polygraph examination in which he denied having anal intercourse with E.C., Perez claimed that his encounter with E.C. was consensual.

[5] No gun was found.

[6] Perez pleaded guilty to this charge, and it was not at issue at trial.

recorded statement, it was a "false confession." White did not testify at trial. However, during E.C.'s testimony, White nodded in agreement when E.C. said that "snitches end up in ditches."

At the conclusion of the trial, the jury found both White and Perez guilty of assault in the second degree, two counts of rape in the second degree, and unlawful imprisonment.

White's sentencing was stayed based on concerns as to his mental competency to be sentenced. He was subsequently found incompetent and committed for further evaluation and treatment. During this time, the trial court allowed White's trial counsel to withdraw, over the State's objection, based on a potential conflict of interest—specifically, that counsel could become a fact witness regarding White's competency to stand trial.

White's competency was restored after several months and he appeared for sentencing. White was sentenced within the standard range, based on an offender score of 5, for assault in the second degree. A term of 36 months of community custody was also imposed on that count. The trial court found that the two counts of rape in the second degree constituted the same criminal conduct for scoring purposes. White was given an indeterminate sentence of 147 months to life for the first count and an indeterminate sentence of zero months to life for the second count. White was sentenced within the standard range for false imprisonment.

White now appeals.[7]

II

White first contends that the information was deficient because it did not contain all of the essential elements of unlawful imprisonment. Relying on this court's decision in State v. Johnson, 172 Wn. App. 112, 297 P.3d 710 (2012), aff'd in part, rev'd in part, 180 Wn.2d 295, 325 P.3d 135 (2014), White asserts that the information should have alleged that the restraint of the victim was "without legal authority." However, in reviewing that very decision, our Supreme Court held to the contrary. Johnson, 180 Wn.2d at 302-03. White's position is, therefore, untenable.

A criminal defendant is entitled to notice of the nature and cause of the accusation against him. Thus, all "essential elements" of the crime must be pleaded in the information and proved beyond a reasonable doubt. State v. Vangerpen, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995). The "to convict" instruction given to the jury must also contain all essential elements of the crime. State v. Smith, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). However, definitions of elements are not themselves essential elements that must be included in either a charging document or a "to convict" instruction. State v. Allen, 176 Wn.2d 611, 626-27, 294 P.3d 679 (2013) (holding that the definition of a "true threat" need not be alleged in the information or included in the "to convict"

---

[7] White filed a motion for a new trial based on CrR 7.5, which was denied. He also filed the same motion based on CrR 7.8, which was transferred to this court for consideration as a personal restraint petition. Neither filing presented issues within the scope of our review of this appeal.

instruction, even though the State is required to prove that the threat in question was a true threat).

RCW 9A.40.040(1) provides that a "person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.010(6) separately defines "restrain" as "to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty."

In Johnson, our Supreme Court held that the definition of "restrain" need not be alleged in the information charging a defendant with unlawful imprisonment. 180 Wn.2d at 302-03; accord State v. Phuong, 174 Wn. App. 494, 542-46, 299 P.3d 37 (2013) (holding that the statutory definition of "restrain" was not an essential element of the offense of unlawful imprisonment that was required to be alleged in the charging document).

Johnson is directly on point and requires that White's claim be rejected. In this case, White was charged with unlawful imprisonment as follows:

> And I, Daniel T. Satterberg, Prosecuting Attorney aforesaid further do accuse LUIS ANDRE PEREZ and CHRISTAPHER TARENCE WHITE, and each of them, of the crime of **Unlawful Imprisonment**, a crime of the same or similar character and based on the same conduct as another crime charged herein, which crimes were part of a common scheme or plan and which crimes were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the other, committed as follows:
>
> That the defendants LUIS ANDRE PEREZ and CHRISTAPHER TARENCE WHITE, and each of them, together with others, in King County, Washington, during a period of time intervening between January 20, 2010 through January 22, 2010, did knowingly restrain E.C., a human being.

This charging language is the same as the charging language upheld in <u>Johnson</u>, 180 Wn.2d at 301-03. There was no error.

## III

White next contends that the jury instruction defining "reckless" was erroneous, thus relieving the State of its burden of proving the elements of assault in the second degree. In the alternative, White claims that his trial counsel was ineffective for not objecting to the "reckless" definitional instruction that was given to the jury. However, in <u>Johnson</u>, our Supreme Court held that a jury instruction defining recklessness—identical to the instruction given in this case—is sufficient when coupled with a "to convict" instruction that accurately sets forth the essential elements of the crime. 180 Wn.2d at 304-06. Moreover, White cannot demonstrate either deficient performance or prejudice arising from his trial counsel's decision not to object to the definitional instruction given. We, therefore, reject White's contentions.

Jury instructions are constitutionally sufficient if they properly inform the jury of the applicable law, are not misleading, and allow the parties to argue their supported theories of the case. <u>State v. Barnes</u>, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). Moreover, pursuant to RAP 2.5(a)(3),[8] a claim of instructional error cannot be raised for the first time on appeal unless the claimed error is a

---

[8] RAP 2.5 provides in pertinent part:
**(a) Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court:. . . (3) manifest error affecting a constitutional right. A party or the court may raise at any time the question of appellate court jurisdiction.

"manifest" error of truly constitutional magnitude. State v. Scott, 110 Wn.2d 682, 684-90, 757 P.2d 492 (1988). Further, "[t]he requirements of due process usually are met when the jury is informed of all the elements of an offense and instructed that unless each element is established beyond a reasonable doubt the defendant must be acquitted." Scott, 110 Wn.2d at 690.

In this case, White was charged with assault in the second degree pursuant to RCW 9A.36.021(1)(a) for "intentionally assault[ing] another and thereby recklessly inflict[ing] substantial bodily harm upon E.C." The crime of assault in the second degree was defined for the jury as "when [the defendant] or an accomplice intentionally assaults another and thereby recklessly inflicts substantial bodily harm." The "to convict" instruction further required the State to prove beyond a reasonable doubt that White or an accomplice "recklessly inflicted substantial bodily harm on [E.C.]." "Reckless" was then separately defined, without objection, thusly: "A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur."

In Johnson, which also involved a charge of assault in the second degree under the "substantial bodily harm" means and a claim of ineffective assistance of counsel, our Supreme Court held that the same instructions that were given in this case were sufficient to convey the applicable law to the jury and did not relieve the State of its burden of proof. 180 Wn.2d at 304-06. As the court stated,

> [I]t is not error to use the generic definition of "reckless" when the "to convict" instruction contains all of the essential elements, including the charge-specific language for recklessness. Having found that no error occurred, we hold that counsel provided effective assistance.

Johnson, 180 Wn.2d at 307.

Johnson is dispositive of both of White's arguments. The jury instructions were correct. Counsel was not ineffective for declining to interpose an objection. There was no error.

## IV

White next argues that the trial court erred in admitting into evidence ski masks that were found in the basement where E.C. was raped and held against her will. White claims that the admission of the ski masks served no legitimate evidentiary purpose and, instead, invited the jury to improperly conclude that he was a "criminal type." We disagree.

We review a trial court's evidentiary rulings for abuse of discretion. State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). We will overturn the trial court's rulings on the admissibility of evidence only if its decision was "manifestly unreasonable or based upon untenable grounds or reasons." Powell, 126 Wn.2d at 258. In close cases "'the scale should be tipped in favor of the defendant.'" State v. Smith, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (quoting State v. Bennett, 36 Wn. App. 176, 180, 672 P.2d 772 (1983)).

Evidence Rule (ER) 402 provides that evidence that is not relevant is not admissible. Relevant evidence is defined in ER 401 as evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence.

> ER 404(b) provides:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"This prohibition encompasses not only prior bad acts and unpopular behavior but *any* evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of a crime." State v. Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting State v. Everybodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)).

ER 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice.[9] This rule is "not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." Foxhoven, 161 Wn.2d at 175 (quoting State v. Lough, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)). The trial court has "wide discretion in balancing the probative value of evidence against its potential prejudicial impact." State v. Stenson, 132 Wn.2d 668, 702, 940 P.2d 1239 (1997).

---

[9] This rule applies to evidence that would otherwise be admissible pursuant to ER 404(b). State v. Saltarelli, 98 Wn.2d 358, 361, 655 P.2d 697 (1982).

Thus, the following framework emerges: In determining whether evidence of other crimes, wrongs, or acts is admissible—other than to prove the character of the accused in order to show that he acted in conformity therewith—the court must consider the relevance of that evidence. State v. Saltarelli, 98 Wn.2d 358, 361-62, 655 P.2d 697 (1982). In order to do this, it must decide whether the evidence makes the existence of any fact that is of consequence to the determination of the action more or less probable. Saltarelli, 98 Wn.2d at 361-62 (citing ER 402). If the evidence is determined to be relevant, then its probative value must be balanced against its unfairly prejudicial effect. Saltarelli, 98 Wn.2d at 362 (citing ER 403).

The trial court correctly ruled that the ski masks—as well as the gun case, ammunition magazines, and ammunition—were admissible as they were relevant to motive.[10]

The State's theory of the case was that O'Dell was the leader of a criminal enterprise in which all three men were engaged and that O'Dell, upon learning that E.C. had threatened to "snitch" to the police about their criminal activity, ordered White and Perez to assault and rape or murder her. In support of this theory, the State planned to offer—and the defense, in turn, sought to exclude—the following items, all indicative of criminal activity, which were found during searches of O'Dell's home and car:

- body armor found upstairs in O'Dell's room;

---

[10] From the appellate briefing, it is not clear that the parties apprehend the basis of the trial court's ruling, as stated by the trial court.

- a gun holster found in an upstairs bathroom;

- a gun case, gun holster, ammunition magazines, and ammunition, all found in Perez's room downstairs;

- the ski masks, both found downstairs—one in a bedroom and one in the studio;

- packaging baggies with marijuana leaves on them found downstairs;

- prescription pills founds in Perez's shorts.

After thorough consideration, the trial court ruled that only the gun case, ammunition magazines, ammunition, and the ski masks were admissible. The evidence of drug activity and evidence found in other areas of the house was excluded. These items were relevant but were nevertheless excluded because the trial court was concerned with the possibility of unfair prejudice. See ER 403.

The trial court agreed with the State that the items recovered pursuant to the constitutional searches of O'Dell's home and car were relevant evidence of motive[11]—and so do we. According to the State's theory, O'Dell directed White and Perez to harm E.C. because she had threatened to "snitch" on them. This invites the question of about what, exactly, E.C. would be "snitching" to the police. The items found throughout the house and in the car lead to an inference that O'Dell—and White and Perez, who were both living in the house at the

---

[11] In considering a defense motion to sever the rape charges from the others, the trial court explained: "[I]s all of this 404(b) evidence cross-admissible as to all charges? Certainly, as to motive, the exception of motive under ER 404(b), it would be cross-admissible if I deem it admissible under ER 403. So the fact that it might also be admissible for showing the reasonableness of the witness's fear for one charge, that is the unlawful imprisonment charge, doesn't necessarily—isn't dispositive of this issue because it would be cross-admissible as motive evidence as to all three charges."

time—were involved in some sort of criminal enterprise involving guns and drugs. This inference supports the State's theory of the motive for the charged crimes. Therefore, the evidence was admissible pursuant to ER 404(b) as "proof of motive."

The trial court did not abuse its discretion pursuant to ER 403 in admitting the challenged items. Taken together, the evidence offered by the State in support of its theory of motive was cumulative. It all tended to prove that O'Dell was running some sort of criminal enterprise out of his home and that the others also played some sort of role in it. In order to guard against the risk of unfair prejudice to White due to the cumulative motive evidence, the trial court excluded some of that evidence. The court was particularly concerned about the risk the drug evidence might present, resulting in the exclusion of those items. The court also chose to exclude all of the evidence found upstairs. It is true that the remaining items—that is, the items that were ruled admissible—risked prejudicing the defendant, but that is always the case with relevant evidence. Our concern is not with prejudice but with *unfair* prejudice. We find no error.[12]

Moreover, based on our review of the record, we are of a firm belief that White was not convicted because the jury misperceived the evidence against him or drew an improper conclusion that he was "a criminal-type person who would

---

[12] Because we hold that the ski masks were properly admitted as motive evidence, we need not analyze whether the ski masks were also properly admitted as evidence of the reasonableness of E.C.'s fear. However, were we called upon to do so, we would adopt the analysis, reasoning, and result of the court as expressed in the decision affirming co-defendant Perez's convictions. See State v. Perez, No. 69005-1-I, 2014 WL 4316949, at *9-10 (Wash. Ct. App. July 14, 2014).

be likely to commit the crime charged." See Foxhoven, 161 Wn.2d at 175. The evidence of White's guilt of the crimes charged—including E.C.'s testimony, the physical evidence at the scene, and White's own statement to his housemates that he "fucked" her—was strong and compelling.

V

White next argues that, at sentencing, the trial court calculated his offender score incorrectly when sentencing him for assault in the second degree. The State agrees that White's offender score for this conviction should be 4 rather than 5. We accept the State's concession.

The trial court found that the two convictions for rape in the second degree constituted the same criminal conduct. Accordingly, one of the rape counts should not be included in White's offender score on any of the other counts because the two rape convictions are scored as one crime for sentencing purposes. Former RCW 9.94A.589(1)(a) (2002). Therefore, on the assault in the second degree count, the rape charges score as a total of 2, the unlawful imprisonment scores as a 1, and White's two prior juvenile offenses score as one-half point each for a total of 4 points. See RCW 9.94A.525(8). However, the trial court incorrectly found a score of 5 on that count.

Owing to the trial court's miscalculation, we remand for resentencing on the assault in the second degree count, based on an offender score of 4. See RCW 9.94A.510; RCW 9.94A.515.[13]

_____

[13] In its brief, the State contends that "the trial court also erred in calculating the standard range for Count V as "0" and in imposing no sentence whatsoever on Count V." The State did not

VI

White next argues that the trial court imposed an incorrect term of community custody for his conviction of assault in the second degree. The State agrees. Again, we accept the State's concession.

The applicable statute dictates that the term of community custody should be 18 months. See RCW 9.94A.701(2). The judgment and sentence reflects that the term of community custody for Count I is 36 months. Accordingly, we remand for the trial court to amend the judgment and sentence to reflect that the term of community custody on Count I is 18 months.

VII

In a statement of additional grounds, White asserts that the trial court erred by denying his request to have his competency evaluated.[14] We disagree.

RCW 10.77.060(1)(a) requires a competency hearing whenever there is "reason to doubt" a defendant's competency. "A reason to doubt" is not defined in the statute but vests a large measure of discretion in the trial judge. City of

---

file a cross appeal. Thus, we will not address its contention. However, nothing in this opinion should be construed as foreclosing the State from making this argument on remand. See RCW 9.94A.530(2) ("On remand for resentencing following appeal or collateral attack, the parties shall have the opportunity to present and the court to consider all relevant evidence regarding criminal history, including criminal history not previously presented."); State v. Collicott, 118 Wn.2d 649, 669, 827 P.2d 263 (1992) (remanding for imposition of a correct offender score and resentencing).

[14] White's claim was not clearly stated. He used some broad language, but he focused his claim as follows: "The Judge should have ordered the court to get me a psych evaluation when Thomas Coe [(White's counsel)] . . . said me and his communication had gotten tougher."

The conclusion that this was the intended focus of his claim is supported by White's repeated references to the Verbatim Report of Proceedings for December 8, 2011, the date on which the court denied White's request "to stay the proceedings or halt the proceedings for any type of competency evaluation."

To the extent that White made other claims related to his competency at trial, given the state of the record on direct appeal, those claims do not afford him an entitlement to relief. His remedy, if any, lies in a collateral attack.

Seattle v. Gordon, 39 Wn. App. 437, 441, 693 P.2d 741 (1985); see State v. Hanson, 20 Wn. App. 579, 582, 581 P.2d 589 (1978) (The determination that an accused is competent to stand trial is within the trial court's discretion, and will not be reversed on appeal absent manifest abuse of discretion.).

While there are no fixed signs that invariably require a competency hearing, factors to be considered include evidence of a defendant's irrational behavior, his demeanor, medical opinions on competence, and the opinion of defense counsel. State v. O'Neal, 23 Wn. App. 899, 902, 600 P.2d 570 (1979). The fact that a motion to determine competency has been made does not by itself constitute a reason to doubt; the motion must be supported by a factual basis. State v. Lord, 117 Wn.2d 829, 901, 822 P.2d 177 (1991).

In this case, the trial court described the circumstances informing its decision to deny the request for a competency evaluation as follows:

> [O]n December 8, 2011, Mr. White's trial counsel, Tom Coe, expressed a desire to "put forward some of [his] concerns about Mr. White's mental state." He stated that before trial, his client had been coherent and was able to follow conversations with him, but that during trial his client had exhibited behavior "that's not been consistent with someone that really appreciates the gravity of not only the situation, but also the proceedings and the seriousness of the proceedings." Mr. Coe reported that a jail guard had indicated that morning that Mr. White was babbling incoherently. He also stated that Mr. White was talking about a defense investigator dancing around the courtroom in a clown costume, Mr. White was smirking at inappropriate times during witness testimony, Mr. White was waving to family members in the courtroom during trial, and he waved to the jury when a witness identified him. Mr. Coe also stated that he had attempted to explain a possible plea deal to Mr. White that morning but he had refused the offered deal. Mr. Coe believed that Mr. White was aware that the two rape charges could run consecutively and that he was facing an indeterminate

sentence of as much as 30 years if convicted, but Mr. Coe was not sure that Mr. White appreciated the risk of a life sentence.

Counsel for Mr. White's co-defendant, Teresa Griffith, stated that she had informed Mr. Coe, early on in the trial, that Mr. White was making nonsensical comments to her and to her client. She stated that she and Mr. Coe had had several discussions about what she thought were Mr. White's "below-intelligence behavior."

The jail guard informed the Court that while some of Mr. White's behaviors were "a little bit bizarre," Mr. White was "lucid and can carry conversations and he complies with my orders." The prosecutor, Sean O'Donnell, stated that he had had interactions with both Mr. Coe and Mr. White that morning and that he overheard Mr. Coe tell Mr. White that he was discussing a plea deal with Mr. O'Donnell. Mr. White's response to Mr. Coe was that he would only plead guilty to the two charges of assault in the second degree. Mr. O'Donnell described the comment as coherent and focused. The State opposed any stay for the purpose of conducting a competency evaluation. Neither Mr. Coe nor the State asked the Court to question Mr. White directly about his understanding of the charges or his ability to assist in his defense during trial.

The Court refused to stay the trial, which was in its second week by that point, and noted that it had not observed any behavior or heard any statements made by Mr. White that raised a concern about his competency. Mr. White had comported himself in the courtroom with appropriate decorum, and had not disrupted the proceedings in any way. The Court observed Mr. White while the Court addressed counsel and saw him nod in agreement to the Court's comments, indicating to the Court that he was tracking the discussion without difficulty.

Although the Court refused to stay the proceedings for the purpose of ordering a formal RCW 10.77 competency evaluation, the Court indicated its intent to take time to conduct research on the issue to ensure that it had "done all of the analysis that needs to be done on the record." The Court indicated its intent to review case law over the break in the trial. The Court also agreed with defense counsel that he could have an independent professional examine his client over the weekend.

The following Monday, December 12, 2011, Mr. Coe informed the Court that, with regard to Mr. White's competency, he

- 21 -

had spent an hour and a half with Mr. White on the preceding Friday. Mr. Coe reported that he had asked Mr. White a number of serious questions and that "he was answering appropriately and my fears were dispelled. I would also note that we had a very productive meeting that day and he was on point throughout." . . . In Mr. Coe's November 7, 2012 declaration, he confirmed that as a result, he withdrew his motion for a competency evaluation.

The foregoing analysis makes it eminently clear that the trial court carefully considered its decision to deny White's request for a competency evaluation. There was no abuse of discretion.

## VIII

White also contends that his trial counsel provided ineffective assistance because he failed to obtain a psychiatric evaluation of White before trial. We disagree.

To determine whether a defendant had constitutionally sufficient representation:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Jeffries, 105 Wn.2d 398, 418, 717 P.2d 722 (1986).

"There is a strong presumption that counsel have rendered adequate assistance and made all significant decisions in the exercise of reasonably

professional judgment such that their conduct falls within the wide range of reasonable professional assistance." Lord, 117 Wn.2d at 883. The reasonableness of counsel's challenged conduct must be viewed in light of all of the circumstances, on the facts of the particular case as of the time of counsel's conduct. Strickland, 466 U.S. at 689–90. If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, then it cannot serve as a basis for a claim that the defendant did not receive effective assistance of counsel. State v. Adams, 91 Wn.2d 86, 90, 586 P.2d 1168 (1978).

Where, as here, the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record. State v. Crane, 116 Wn.2d 315, 335, 804 P.2d 10 (1991); State v. Blight, 89 Wn.2d 38, 45-46, 569 P.2d 1129 (1977).

There is no dispute that—prior to trial—Coe did not voice any concerns regarding White's competency to the court or have White's competency independently evaluated.

At trial, Coe explained the information he had prior to trial regarding White's mental state in the weeks leading up to trial. According to Coe:

> The months leading up to this incident, I had had reports from various family members when they went to visit him that he was not coherent and not acting appropriately. There were – there was a period where every time I came up to visit him, they wouldn't bring him out because he wasn't obeying directives. I, at that point, feared for the worst. And that was for, I – I believe, a period of about two weeks where I – I couldn't have access to him because he wouldn't come out and they wouldn't let him out because of his behavior. When he finally did come out, I was surprisingly surprised that he was coherent and following my conversations. And my fears were dispelled. And that – that was several weeks

prior to trial, maybe even more. And then during the lead up to trial, you know, again, by and large, there was an occasional sort of deviation, but by and large, he was doing pretty well.

The evidence in the record regarding the information pertaining to White's mental state available to Coe prior to trial—namely, Coe's own statements recalling that time—do not support White's present claims of ineffective assistance.[15] He does not establish an entitlement to appellate relief.

Affirmed in part and remanded for further proceedings consistent with this opinion.

We concur:

---

[15] White makes two additional claims in his statement of additional grounds: (1) that there was insufficient evidence to convict him, and (2) that he was not convicted by a jury of his peers ("I did not have a jury of my peers. All of them were older than me and none of them were my ethnicity.").

In support of the first claim, White argues (1) that none of his DNA was found on the victim, and (2) there were problems with the testimony of some of the witnesses ("[T]he criminals who lied against me was only hearsay they did not see me do anything like that. . . . During the case they . . . changed their story's many times."). First, DNA evidence was not required in order to convict White of the crimes charged. Second, the jury was entitled to credit or discredit the testimony of the witnesses against White.

With regard to White's second claim, White is not constitutionally entitled to a jury composed of members of his same age and race. See Taylor v. Louisiana, 419 U.S. 522, 538, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975) ("It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition.").