IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31441-3-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BENJAMIN LOPEZ, JR., | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury found Benjamin Lopez guilty of second degree

murder and drive-by shooting after a member of a rival gang was shot and killed.

Benjamin[1] appeals. He raises three issues. First, he contends that the court's to-convict

jury instructions violated due process by misstating the reasonable doubt standard, which

allowed the jury to convict even if reasonable doubt existed. Second, he contends that the

evidence was not sufficient to prove that he acted as an accomplice to the crimes. Last,

he contends that the prosecutor committed misconduct during closing argument, and the

cumulative error of the misconduct warrants reversal. We disagree with these contentions

---

[1] To avoid confusion between Abraham Lopez Torres and his brother Benjamin
Lopez, we refer to the men by their first names.

and affirm.

## FACTS

On April 22, 2011, Adan Beltran was shot and killed outside of his home in Quincy, Washington. Four men were associated with the shooting—Abraham Lopez Torres, Benjamin Lopez, Alexis Hernandez, and Roberto Murillo.

Abraham, Benjamin, and Mr. Hernandez are members of the Marijuanos 13 street gang, while Mr. Murillo is a member of a Surenos gang. The victim, Mr. Beltran, was a member of the West Side 18th Street gang. The Marijuanos 13 gang and West Side 18th gang are rivals and have physically fought with each other. Rumors circulated that the West Side 18th Street gang was responsible for the death of Marijuanos 13 member Edwin "Chow" Davalos, with Mr. Beltran being the shooter. Mr. Davalos and Benjamin were close friends.

Benjamin was charged with first degree premeditated murder, second degree murder, and drive-by shooting. Several aggravating circumstances were also charged, including a gang aggravator. Brothers Abraham and Benjamin were tried together. The State gave Mr. Hernandez immunity for his involvement with the crime in return for his testimony at Abraham's and Benjamin's trial. Mr. Murillo pleaded guilty to second degree murder and did not testify.

At the Lopez brothers' trial, Mr. Hernandez testified that he went to Quincy on April 22 to meet with Benjamin and Abraham at the house of Marcos Avalos. Upon arriving at the house, Mr. Hernandez saw Benjamin sitting in the front passenger seat of a car, Abraham sitting in the driver's side passenger seat, and Robert Murillo driving the car. Mr. Hernandez got into the rear passenger's side seat. Benjamin wanted to buy marijuana. Benjamin gave driving directions to Mr. Murillo.

Eventually, the car turned down an alley. Mr. Hernandez observed Abraham putting on a pair of gloves. The car stopped in the alley between two houses. Abraham got out of the car and left. Shortly after, Mr. Hernandez heard multiple gun shots. He then saw Abraham running back to the car. The bandana Abraham was wearing covered the bottom half of his face and his sweatshirt hood was on with the strings cinched. Only his eyes were visible. Abraham got back into the vehicle and it sped off. Mr. Hernandez noticed a .357 caliber handgun on the seat next to him. Benjamin gave driving directions to Mr. Murillo on how to get out of town.

The men parked by a canal to smoke some spice. Then, as they drove toward Wenatchee, a police chase ensued. Abraham attempted to give guns to Mr. Hernandez but Mr. Hernandez refused to get involved. Mr. Hernandez believed that Benjamin took

3

the guns. As the vehicle stopped, Mr. Hernandez saw Benjamin throw something out of the window.

Benjamin testified to a different account of the crime. He said that he was at Mr. Avalos's house with Abraham and Mr. Hernandez for a barbeque. When Mr. Murillo arrived at the party, they all got into his car to buy marijuana from a dealer that Benjamin knew.

On the way to the dealer's house, someone saw Mr. Beltran in front of his home. The men discussed that Mr. Beltran had been deported. Benjamin could not see well and doubted that the man was Mr. Beltran because of the deportation. Benjamin noticed that Mr. Hernandez and Mr. Murillo were tense.

Mr. Murillo turned down an alley in the trailer park. Benjamin heard a gun cock behind him where Mr. Hernandez was sitting. Mr. Hernandez handed something up to Mr. Murillo. Benjamin did not see the object, but believed it was a gun. The men stopped at a trailer. Mr. Murillo said "let's go" and got out of the car with Mr. Hernandez and Abraham. 10 Report of Proceedings (RP) at 199. Benjamin stayed inside and told Abraham to get back into the car because he sensed something was going on. Abraham walked a few feet and got back into the car. Mr. Murillo and Mr. Hernandez went around the trailer and out of sight of Benjamin. Benjamin heard two or three gunshots and then

4

saw Mr. Murillo and Mr. Hernandez jogging back to the car. The men took their same seats and sped off. As they left, they almost hit another car.

As they parked by the canal to smoke spice, Benjamin asked Mr. Murillo what happened. Mr. Murillo said nothing, and to shut up and kick back. The men were apprehended after being chased by police. Benjamin testified that Mr. Murillo and Mr. Hernandez told him not to talk to the police.

Four members of the Garces family saw the shooting and testified at trial. Alexia Garces witnessed the shooting as she was riding in her mother's vehicle. She testified that she saw a man with a gun shoot another man who was running away. She said the shooter was wearing dark gloves, dark pants and hoodie with the hood up. The shooter quickly got into a car and left down the alley.

Alexia's father and brother were traveling behind Alexia and her mother. Three of the family members stated that they saw the shooter get back into the rear driver's side of a blue four-door sedan. Two of the family members testified that this same vehicle nearly collided with them as it attempted to flee the scene. All four family members said that the occupants of the vehicle were Hispanic males.

Mr. Beltran was dead by the time emergency personnel responded to the scene of the shooting. The Washington State Crime Lab determined that the bullet found in Mr.

Beltran's body was fired out of a .25 caliber semi-automatic. The gun was found next to the front passenger side door of the suspect's car, the location where Benjamin was sitting.

DNA[2] analysis was performed on items involved in the crime, including a blue knit glove found inside the vehicle. The investigator found that Abraham was a substantial contributor to the DNA found on the blue knit glove, with one in 42,000 persons matching the profile.

The State introduced testimony and exhibits regarding gang culture in the area. Deputy Joe Harris, a Grant County police officer with specialized gang training, explained that it was his job to keep track of gangs in the area and gear members toward resources that would help them change their lifestyle. Deputy Harris said that a member is expected to benefit the gang by "putting in work." 7 RP at 41. Work includes assaulting rival gang members, and it is expected that members will do something to disrespect a rival gang member when paths cross, such as throwing gang signs, trying to instigate a fight, or attacking immediately. A gang member earns respect by putting in work. Deputy Harris also said that killing a rival gang member suspected of killing a member of your gang would be "putting in work." 7 RP at 63.

---

[2] Deoxyribonucleic acid.

Deputy Harris testified that the Marijuanos 13 gang and West Side 18th Street gang are rivals. He identified signature graffiti from both gangs, noted that an "x" drawn over the gang graffiti is a sign of disrespect, and stated that West Side 18th Street gang graffiti in Quincy had been marked in this way.

Mr. Hernandez and Benjamin testified to the rivalry between the gangs. Mr. Hernandez said that the Marijuanos had x-ed out 18th Street graffiti and that the Marijuanos fought with the 18th Street gang more than 20 times. Mr. Hernandez said that he was shot at by the 18th Street gang three times. Benjamin said that he had been involved in armed fights with the 18th Street gang, and that killing an 18th Streeter would benefit his gang.

Mr. Hernandez said he participated in gang activities with Abraham and Benjamin. He said the murder of Mr. Davalos angered Benjamin and Abraham, as well as himself. He confirmed that Marijuanos rumors alleged Mr. Beltran murdered Mr. Davalos. Mr. Hernandez said that when Mr. Davalos died, one of the brothers said "[o]h, they fucked up." 7 RP at 210. In remembrance, Benjamin tattooed RIP Chow Loco on his arm for Mr. Davalos.

Mr. Hernandez said that committing murder would raise a person's standing in Marijuanos 13. On the other hand, Mr. Hernandez said that a Marijuanos 13 gang rule

7

prohibits testifying against a fellow gang member, and the penalty for violating the rule is that they try to kill you or they do kill you.

When Mr. Hernandez was initially questioned by police, he told them that he knew nothing about the shooting. He also told police that he was scared to testify against Benjamin and Abraham. A few days later, Mr. Hernandez spoke to police again and gave his account of the shooting.

Abraham's attorney drew attention to the fact that Mr. Hernandez entered into a deal with the prosecutor and was given absolute immunity in exchange for his testimony. Defense counsel asked Mr. Hernandez whether his testimony needed to be consistent with what he previously told law enforcement to benefit from the deal. Mr. Hernandez responded that he was to testify to the truth. When defense counsel pointed out that the prosecutor would decide if Mr. Hernandez met the conditions of his agreement to testify, Mr. Hernandez repeated his obligation was to cooperate. A third time Mr. Hernandez stated, "I'm just trying to say the truth." 7 RP at 198.

Benjamin's attorney asked Mr. Hernandez whether he ever thought about his option to lie to police. Mr. Hernandez responded that during his initial interview with police, he did not want to tell police what happened because he was scared. Counsel pressed the point, asking, "Well, you did not only not want to tell them what happened, in

8

fact, you took door number three, didn't you?" 8 RP at 49. Mr. Hernandez responded, "yes," and that door number three was to "lie." 8 RP at 49. When defense counsel repeated "[y]ou lied," Mr. Hernandez responded, "I didn't lie—what I'm saying now is not a lie. What I testified to yesterday and today is not a lie. What I told the officer, I told him I didn't know what happened, which I did know." 8 RP at 49.

Defense counsel asked Mr. Hernandez whether the prosecutor told him to repeatedly say that he was telling the truth and whether he practiced that phrase as part of a script. Mr. Hernandez responded, "He's told me to tell the truth, to do what's right." 8 RP at 64. Defense counsel then questioned Mr. Hernandez about inconsistencies in his testimony. Later, defense counsel again questioned Mr. Hernandez about his deal with the State, stating, "And the exchange [with the State] was this: You testify against them and you will have your murder charges dismissed." 8 RP at 114. Mr. Hernandez replied, "Incorrect. The deal was I cooperate and testify truthfully." 8 RP at 114.

At the conclusion of the State's case, the court dismissed some of the aggravators, but left all charges in place. Abraham and Benjamin stipulated that they were members of the Marijuanos 13 criminal street gang.

The trial court prepared draft jury instructions for the parties to review. The reasonable doubt standard in the trial court's to-convict instructions informed the jury that

9

"if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements[,] then you *should* return a verdict of not guilty." Clerk's Papers (CP) at 143 (emphasis added). A jury instruction conference was held. After receiving comments, the court invited counsel to prepare proposals to incorporate requested modifications into the instructions.

Benjamin's counsel proposed to-convict jury instructions for first and second degree murder that incorporated accomplice liability. Benjamin's proposed instructions also used the phrase "*should* return [a] verdict of not guilty." CP at 128-29 (emphasis added).

After the trial court distributed a third draft of proposed jury instructions, the State alerted the trial court to erroneous wording of the reasonable doubt standard. The State argued that instructing a jury that it "should" return a verdict of not guilty is improper. Instead, the State urged the court to instruct the jury according to the Washington Pattern Jury Instructions, informing the jury of their "duty" to return a verdict of guilty or not guilty based on the evidence. The State said it was involved in an appeal on the very same issue and the argument is that "should" is somewhat optional; not a must. The State posed the question, "Basically is should mandatory enough or can the jury disregard it or do what they want? Basically jury nullification either way." 11 RP at 72.

10

The trial court stated that it had used the "should" language before and the purpose of the language was to allow for jury nullification. The court and the State discussed jury nullification in the presence of the defense. The State took the position that jury nullification and a corresponding instruction was not supported by law.

The court asked for the defense's position on the matter. Abraham's counsel answered, "The court is not—the proposed instruction does not tell the jury that they can nullify their verdict. That's all." 11 RP at 74. When asked by the court if counsel had any objection to the use of the word "should" as opposed to "duty," Abraham's counsel answered "[n]one." 11 RP at 74. The court clarified that the "should" language went "[b]oth directions." 11 RP at 74. Counsel again answered that he had no objection. The trial court then asked Benjamin's counsel if he had any objections. Counsel replied, "We have—we don't take exception to any of the instructions as proposed." 11 RP at 74.

The trial court stated that it was interested in the outcome of the pending appeal on the issue, "[b]ut in this case, since neither defendant—since each defendant waives any objection, then I think I will not make that change and the jury will be instructed as set forth in the third draft." 11 RP at 75. The to-convict instructions informed the jury that it "should return a verdict of not guilty," mirroring the language first suggested by the court and included in Benjamin's proposed jury instruction. CP at 192, 196, 201.

11

A jury found Benjamin guilty of second degree felony murder and guilty of drive-by shooting. The jury found Benjamin not guilty of first degree murder and acquitted him of multiple charged aggravating circumstances.

Benjamin appeals. He assigns error to the to-convict jury instructions. Also, he contends that the evidence was insufficient to convict him of accomplice liability and that the prosecutor committed misconduct during closing arguments.

ANALYSIS

*The Trial Court's To-Convict Instructions.* For the first time on appeal, Benjamin contends that the to-convict jury instructions violated his right to due process because they failed to accurately convey the reasonable doubt standard to the jury. He identifies the reasonable doubt portion of the instruction that states, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, "then you *should* return a verdict of not guilty." CP at 192, 196, 201 (emphasis added). This language changes the reasonable doubt standard in 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 27.04 at 381 (3d ed. 2008) (WPIC) that states "it will be *your duty* to return a verdict of not guilty." (Emphasis added.)

Benjamin maintains that by replacing "your duty" with "should," the trial court's instruction did not impose a mandatory duty on the jury to acquit if reasonable doubt

12

existed. This instruction confused the jury and allowed them to return a guilty verdict even if they had a reasonable doubt as to Benjamin's guilt. Thus, the court relieved the State of the burden of proof beyond a reasonable doubt, thereby violating due process and constituting manifest constitutional error. We agree with Benjamin. *See State v. Smith,* 174 Wn. App. 359, 366, 298 P.3d 785, *review denied,* 178 Wn.2d 1008, 308 P.3d 643 (2013).

In a criminal trial, due process conveys the burden on the State to prove every element of a crime beyond a reasonable doubt. *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994). "A corollary of the due process requirement that a jury find proof beyond a reasonable doubt in order to return a verdict of guilty is that it must return a verdict of not guilty if the State does not carry its burden. . . . It is reversible error to instruct the jury in a manner relieving the State of its burden." *Smith,* 174 Wn. App. at 366. We apply de novo review to a challenged jury instruction. *State v. Bennett,* 161 Wn.2d 303, 307, 165 P.3d 1241 (2007). "The jury instructions, read as a whole, 'must make the relevant legal standard manifestly apparent to the average juror.'" *State v. Kyllo,* 166 Wn.2d 856, 864, 215 P.3d 177 (2009) (quoting *State v. Walden,* 131 Wn.2d 469, 473, 932 P.2d 1237 (1997)).

13

In *Smith*, the trial court prepared jury instructions that differed from the WPIC. *Smith*, 174 Wn. App. at 362. Of importance, the court instructed the jury that "'if, after weighing all the evidence, you have reasonable doubt[,] *you should* return a verdict of not guilty.'" *Id.* at 363 (some alterations in original). On appeal, Mr. Smith argued that the instruction relieved the State of its burden of proof because the instruction left the jury with the impression that it ought to acquit if it possessed reasonable doubt, but acquittal was not mandatory. *Id.* at 366-67. Acknowledging the due process rights at stake, this court allowed Mr. Smith to raise his challenge to the elements instruction for the first time on appeal because it involved a manifest error involving a constitutional right. *Id.* at 365. We held that a corollary of due process requires that a jury must return a verdict of not guilty if the State does not carry its burden of proof beyond a reasonable doubt. *Id.* at 366. And, that even though the jury likely understood that the court's use of "should" in the elements instruction expressed a mandatory action, we could not be sure that it did. *Id.* at 368. The trial court's erroneous instruction was a structural error that required reversal of Mr. Smith's conviction. *Id.* at 368-69.

Here, as in *Smith*, the trial court erroneously instructed the jury that it "should" return a verdict of not guilty based on the evidence. This instruction relieved the State of

14

its burden of proving guilt beyond a reasonable doubt. We decline the State's request to revisit *Smith* and consider cases outside this court's jurisdiction.

Even though *Smith* supports Benjamin's position, we agree with the State that Benjamin cannot raise this issue for the first time on appeal because he invited the error. "Even where a constitutional error is manifest, it can still be waived if the issue is deliberately not litigated during trial." *State v. Hayes*, 165 Wn. App. 507, 515, 265 P.3d 982 (2011).[3] The invited error doctrine prohibits a party from setting up an error at trial then complaining of it on appeal. *State v. Henderson*, 114 Wn.2d 867, 870, 792 P.2d 514 (1990) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680 P.2d 762 (1984), *overruled on other grounds by State v. Olson*, 126 Wn.2d 315, 893 P.2d 629 (1995)). For example, a defendant may not request instructions be given to the jury and then complain upon

---

[3] The State also argued that this issue cannot be raised for the first time on appeal because it is not a manifest error. We disagree. Generally, an error cannot be raised for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). Establishing manifest error requires a showing of actual prejudice. *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). Actual prejudice occurs when the asserted error had practical and identifiable consequences at trial. *Id.* (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). An error in a to-convict instruction is significant because the instruction implicates the standard used by the jury to determine guilt or innocence. *See State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). Thus, misstating the standard by instructing the jury that it can acquit despite the presence of reasonable doubt has practical and identifiable consequences and is a manifest error affecting a constitutional right.

15

appeal that the instructions are constitutionally deficient, even if the error is of constitutional magnitude. *State v. Aho*, 137 Wn.2d 736, 744-45, 975 P.2d 512 (1999). The invited error doctrine applies only where the defendant engaged in some affirmative action by which he knowingly and voluntarily set up the error. *In re Pers. Restraint of Call*, 144 Wn.2d 315, 326-28, 28 P.3d 709 (2001). We apply the invited error doctrine as a "strict rule" to situations where the defendant's actions at least in part caused the error. *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999).

Here, Benjamin invited the error in the jury instructions because he proposed the erroneous instruction. Also, during the jury instruction conference, the State informed Benjamin that the "should" language allowed for jury nullification because it did not impose a mandatory duty to follow the court's instructions on returning a verdict of guilty. Yet, when asked for his position on the instruction, Benjamin's attorney did not take issue with the instruction.

The invited error doctrine precludes Benjamin from challenging the jury instruction on appeal. His appeal raises essentially the same arguments that he rejected in the trial court—no mandatory duty was imposed on the jury to return a not guilty verdict. He cannot complain of an error that he actively set up at trial. Under these circumstances, reversal of Benjamin's convictions is not warranted.

No. 31441-3-III
*State v. Lopez*


*Sufficiency of Evidence to Prove Accomplice Liability.* Benjamin contends that the

evidence is insufficient to support the accomplice liability guilty verdict for drive-by

shooting and second degree felony murder. He maintains that the State failed to prove

that he knew his acts would aid in the drive-by shooting of Mr. Beltran. Further, he

maintains that without an accomplice conviction for the predicate felony, the conviction

for second degree felony murder fails as well.

In every criminal prosecution, due process requires that the State prove, beyond a

reasonable doubt, every fact necessary to constitute the charged crime. *In re Winship*,

397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). When a defendant

challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing

the evidence in the light most favorable to the State, any rational trier of fact could have

found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d

1068 (1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of

the State and interpreted most strongly against the defendant." *Id.* The appellant admits

the truth of the State's evidence and all inferences that can reasonably be drawn from it,

giving equal weight to circumstantial and direct evidence. *State v. Hermann*, 138 Wn.

App. 596, 602, 158 P.3d 96 (2007). We defer to the trier of fact on issues of conflicting

17

testimony, credibility of witnesses, and persuasiveness of the evidence. *State v. Killingsworth*, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).

A person is guilty of second degree felony murder when he or she commits or attempts to commit any felony and, in the course or furtherance of such crime, he or she or another participant causes the death of another person other than one of the participants. RCW 9A.32.050(1)(b). A person is guilty of drive-by shooting when he or she recklessly discharges a firearm in a manner that creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of the motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge. RCW 9A.36.045(1).

For a person to be an accomplice to felony murder, the person must with knowledge that it will promote or facilitate the commission of the crime, solicit, command, encourage, or request such other person to commit it; or aids or agrees to aid such other person in planning or committing it. RCW 9A.08.020(3)(a). A person aids in the commission of a crime if he or she is present and ready to assist in committing the crime. *State v. Wilson*, 95 Wn.2d 828, 833, 631 P.2d 362 (1981).

To convict Benjamin as either an accomplice or a principal, the State needed to prove the particular crime was committed and that Benjamin participated in it. *State v.*

18

*Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004). The criminal liability of an accomplice is the same as that of the principal. *State v. Carter*, 154 Wn.2d 71, 78, 109 P.3d 823 (2005) (quoting *State v. Graham*, 68 Wn. App. 878, 881, 846 P.2d 578 (1993)).

For felony murder, liability may be imputed to a coparticipant who does not actually commit the homicide. *Id.* When one participant in a predicate felony alone commits a homicide during the commission of, or flight from, such felony, another participant in the predicate felony has, by definition, committed felony murder. *Id.* Therefore, in the felony murder context, the State need not prove that the nonkiller participant was an accomplice to the homicide. *Id.* at 79. Rather, the State need prove only that Benjamin was an accomplice and a participant to the felony offense of drive-by shooting. *See id.*

Here, the evidence to convict Benjamin is circumstantial. There is no direct evidence to show that he knew that his brother or one of his friends in the car would shoot Mr. Beltran and that he aided in the crime. However, circumstantial evidence is given the same weight as direct evidence and can support a guilty verdict.

Interpreting the evidence and inferences therefrom in favor of the State, we find there is sufficient evidence to support an accomplice liability verdict for Benjamin. After weighing the credibility of the witness and the evidence, it was possible for the jury to

19

find that Benjamin knew that the murder of Mr. Beltran would occur. Benjamin had motive to participate in the crime. Benjamin's good friend Mr. Davalos was killed, and Benjamin's gang believed Mr. Beltran's gang was responsible for the murder. Benjamin was angry about Mr. Davalos's death. Soon before Mr. Beltran was shot, Benjamin got a tattoo in his memory reading, RIP Chow Loco. Testimony was given at trial that killing a rival gang member that killed a member of your gang earns respect and benefits the gang. Similarly, committing murder in the Marijuanos 13, Benjamin's gang, earned respect.

Additionally, Benjamin's acts prior to and directly after the shooting provided circumstantial evidence that he knew that the men were set on killing Mr. Beltran. Mr. Hernandez testified that Benjamin gave Mr. Murillo directions to the alley where the car stopped. Mr. Hernandez said that Benjamin did not react to Mr. Murillo stopping or when his brother got out of the car. When his brother returned with a gun and a bandana over his face, Benjamin was calm. Benjamin gave directions as the men sped out of town. The jury could infer from these facts that Benjamin knew Abraham and Mr. Murillo intended to commit a drive-by shooting and that Benjamin aided in commission of the crime.

20

*Prosecutor's Closing Argument.* Benjamin contends that the State made several inflammatory statements during closing arguments that amounted to prosecutorial misconduct. We address each statement in turn.

To establish prosecutorial misconduct, Benjamin must show that the prosecutor's statements were improper and, as a result, prejudicial. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). For improper statements that were followed by a proper objection, a prosecutor's statements are prejudicial if the statement had a substantial likelihood of affecting the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

However, "[i]f the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.*

at 762. A proper jury instruction generally cannot cure a statement that has an inflammatory effect. *Id.* at 763.

"Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *Dhaliwal*, 150 Wn.2d at 578. A prosecutor is given wide latitude in closing arguments to draw and express reasonable inferences from the evidence. *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006).

1. *"Right thing to do."* First, Benjamin alleges that the prosecutor attempted to align the jury with the prosecutor's office by telling the jury that convicting Benjamin was the right thing to do. In the beginning of closing argument, the prosecutor said,

> No matter what you do when you get back there to deliberate, it's not going to be easy. Nobody ever told you it would be. . . . But when it's done, I'm going to ask you to do one thing. I'm going to stand here and ask you to do what is right. Because it is proper and because the evidence in the case leaves you only one conclusion.

12 RP at 30.

It is misconduct for a prosecutor to "try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985). Similarly, this court has held that it is improper for the State

to make an argument that could be construed as "telling the jury that it would violate its oath if it disagreed with the State's theory of the evidence." *State v. Coleman*, 74 Wn. App. 835, 839, 876 P.2d 458 (1994).

Here, the prosecutor's statement, when taken in context, was not improper. The statement did not attempt to align the jury with the prosecutor or instruct the jury that it could submit a guilty verdict based on what it believed was right. Instead, the prosecutor instructed the jury that it should do what was right based on the evidence, even though getting to that decision may be tough. The prosecutor did not tell the jury that it must reach the State's conclusion in order to do what is right.

Benjamin contends that the State continued this theme of the "right thing to do" throughout the trial. He also calls attention to the prosecutor's discussion of Mr. Hernandez's decision to testify. The prosecutor stated, "But [Mr. Hernandez] did decide to do the right thing after the police told him his mother wanted him to, and he quickly gave them an initial outline that completely fit the facts of this case." 12 RP at 53. Additionally, Benjamin contends that the statement is improper because no evidence presented at trial addressed Mr. Hernandez's mother's wishes. It is reversible error for a prosecutor to urge a jury to decide a case based on evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012).

23

Again, this statement does not attempt to align the jury with the State. Instead, when taken in context, the statement responded to defense's theory that Mr. Hernandez's testimony was not credible because he was given a deal for his testimony. While true that there was no evidence to support the statement that he told the investigating officer the truth because his mother wanted him to, Mr. Hernandez did testify that he talked to police because he decided to do the right thing and that police told him his mom was sad. Even with this error referencing the mother, the comment was a brief, one time assertion that could have been cured by a limiting instruction. This minor misstatement did not likely affect the jury's verdict.

2. *Send a message.* Benjamin contends that the prosecutor committed misconduct by encouraging the jury to return a guilty verdict in order to send a message to gangs in the local community. For instance, he cites the prosecutor's statements, "You heard Alexis Hernandez say that he had been shot at on three separate occasions. This is an 18 year old who's already been shot at on three separate occasions. This is out of hand." 12 RP at 32. Benjamin also contends that this statement inappropriately implies that Benjamin was somehow responsible for shots being fired at Mr. Hernandez.

A prosecutor's closing statement is improper if it merely appeals to the passion and prejudice of a jury or references prejudicial allusions outside of evidence. *State v.*

24

*Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988) (quoting *State v. Belgarde*, 46 Wn. App. 441, 448, 730 P.2d 746 (1986)). "[A] prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups or invokes racial, ethnic, or religious prejudice as a reason to convict." *Perez-Mejia*, 134 Wn. App. at 916. Misconduct also occurs when a prosecutor repeatedly urges jurors to convict a criminal in order to protect community values, preserve civil order, or deter future criminal activity. *State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011) (quoting *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991)).

In *Perez-Mejia*, the court held that the prosecutor's closing argument was improper and prejudicial when the prosecutor asked the jury to

> "[s]end a message to Scorpion, to other members of his gang . . . and to all the other people who choose to dwell in the underworld of gangs. That message is we had enough. We will not tolerate it any longer. That we as citizens of the State of Washington and the United States of America, we have the right to life, liberty and the pursuit of happiness and we will no longer allow those who choose to dwell in the underworld of gangs to stifle our rights. And that message begins now.
> It begins now by finding that the defendant was involved in the death of Ms. Emmitt."

*Perez-Mejia*, 134 Wn. App. at 917 (footnote omitted). The trial court overruled the defendant's objection "to call for messages." *Id.* The appellate court ruled that this argument improperly invoked the juror's patriotic sentiment and cast the defendant as an

oppressor of inalienable rights. *Id.* at 918. This, when combined with a statement referencing the defendant's "machismo," were racially prejudicial comments that affected the jury's verdict. *Id.* Additionally, the court found that the prejudice was magnified by the issues in the case. *Id.* Of importance, the court found that the statement appealed to the jury's passion and prejudice by inviting them to decide based on their fear of crime. *Id.* at 919.

In *Belgarde*, the prosecutor referenced the American Indian Movement (AIM) and the chilling events of Wounded Knee, South Dakota. *Belgarde*, 110 Wn.2d at 507. The prosecutor said the group was a militant group to be afraid of like the Irish Republican Army and that the defendant was a part of the group. *Id.* at 506-07. The defendant did not object. *Id.* at 507-08. On appeal, the court concluded that the statements were improper and prejudicial. *Id.* at 508. The court held that an objection and instruction to disregard could not have erased the fear and revulsions jurors would have felt if they had believed the prosecutor's descriptions of the Indians involved in AIM. *Id.* at 507-08. Additionally, the court found that the prosecutor's statements could not be considered proper argument because they were not supported by any evidence in the case. *Id.* at 508-09. Thus, the prosecutor's statements, which were based on his own memory of the events of Wounded Knee, was testimony and improper. *Id.*

26

Here, the prosecutor's statement did not directly ask the jury to convict Benjamin in order to send a message to gangs in Grant County. However, it does appeal to the passion and prejudice of a jury by calling attention to the amount of gang violence in the community and implying that a conviction would help stop the violence. Even then, we do not find this statement flagrant and ill-intentioned to the point that it could not have been cured by a limiting instruction. *See Dhaliwal*, 150 Wn.2d at 580-81. While the statement calls attention to gang violence, the State's theory of motive was gang retaliation. The State produced evidence of repeated gang violence, including Mr. Hernandez's testimony that he was shot at on three separate occasions. There is no inference that either Abraham or Benjamin was responsible for the three shootings at Mr. Hernandez.

*Perez-Mejia* and *Belgarde* do not persuade us to reach a different conclusion. Both of those cases involve arguments that do more than simply reference the out-of-control nature of gang violence and are much more egregious than Benjamin's situation. The prosecutors in *Perez-Mejia* and *Belgarde* both made improper, unsupported references to classes of people and used prejudice and stereotypes as a basis for finding guilt. The prosecutor appealed to the passion and prejudice of the jury by asking to

decide based on fear of these groups of people. In both cases, the argument was repeated and not based on evidence presented at trial.

At Benjamin's trial, the contested statement that gang violence is out of hand was not the overarching theme of the case. Admittedly, while gang activity and retribution was mentioned throughout the prosecution's closing argument, this was based on evidence of gang violence presented at trial and the State's theory of motive. Most importantly, the statements did not reinforce stereotypes or invoke racial prejudices. The prosecutor's statement was not so inflammatory that it could not have been cured by an instruction and, thus, did not constitute prosecutorial misconduct.

3. *Propensity for violence*. Benjamin contends that the prosecutor committed misconduct by encouraging the jury to use evidence of gang affiliations to conclude that Benjamin had a propensity for violence. For example, he quotes the prosecutor,

> Let's talk for a moment about common sense and human emotion. These young men have committed their lives to this group, and we know that one of their friends was murdered. And we know from our human experience that revenge and retribution is a natural human desire. Maybe not for everyone. Maybe not for everyone in this courtroom. Maybe not for everyone in the world. But it is definitely fair to say that it is a natural desire for many. And certainly it would be a more natural desire for people who have committed their lives to a criminal street gang, people who have actively engaged in back and forth fighting.

12 RP at 38.

28

Prior bad acts cannot be used to establish a person's propensity to commit a current crime. ER 404(b). "[T]he only relevance between the prior acts and the current act is the inference that once a criminal always a criminal." *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999).

Evidence of gang affiliation is presumed prejudicial. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). However, when evidence of gang membership can be connected to the crime, such evidence is admissible. *Id.* "Courts have regularly admitted gang affiliation evidence to establish the motive for a crime or to show that defendants were acting in concert." *Id.* at 527.

The prosecutor was free to discuss gang affiliation during closing argument. Benjamin stipulated to his membership in the Marijuanos 13 gang during trial. Furthermore, Benjamin was charged with the aggravating circumstance that he committed the crime to benefit a criminal street gang, so gang affiliation was crucial for this charge.

Although armed with evidence of gang affiliation, the prosecutor did not use Benjamin's gang membership to show his propensity to commit the shooting. The prosecutor did not ask the jury to convict Benjamin based on his membership in a criminal street gang or because he had a natural desire to seek revenge and retribution. Instead, the prosecutor used gang affiliation as part of the motive for the crime—

retribution for the death of Mr. Davalos, a fellow gang member. In Benjamin's situation, evidence showed that he and Mr. Davalos had a close relationship, that he was upset when Mr. Davalos was killed, and that gang members suspected Mr. Beltran of the crime. Mr. Beltran was a member of a rival street gang that often fought with Benjamin's gang. Testimony established that it was common in gang culture to kill members of rival gangs when the rival member is suspected of killing a member of the opposing gang. In Benjamin's gang, committing murder would raise a person's standing. In sum, the prosecutor did not use gang membership to show propensity, but instead to show motive for the current crime. The prosecutor used the above statement to explain the thought processes of gang members and why Benjamin would act as an accomplice to the murder. This argument was not improper.

4. *Vouching for the credibility of a witness.* Benjamin contends that the prosecutor improperly vouched for the credibility of Mr. Hernandez by personally supporting his testimony and by adding facts not in the record. He gives four examples of this error. First, Benjamin contends that the prosecutor used a stereotype to support credibility by arguing that the jury should believe Mr. Hernandez's testimony because Mr. Hernandez was not smart enough to lie. Second, he contends that the prosecutor attempted to bolster Mr. Hernandez's testimony by telling the jury that Mr. Hernandez

would have come up with a better story if he was lying. Third, Benjamin contends that the prosecutor implied that he personally believed Mr. Hernandez when he told the jury that Mr. Hernandez risked his life to tell the truth. Fourth, the prosecutor again affirmed his own belief in Mr. Hernandez's testimony by arguing that Mr. Hernandez knew he needed to tell the truth so his story would not be disproven by other evidence.

Benjamin identifies two particular statements that support his contentions. First, he cites to the prosecutor's statement, "And there's one other thing that the jury probably picked up on. [Mr. Hernandez] is not real bright. He's just not a real bright guy. He just doesn't have the ability to make up a complex story and be consistent with it. He just doesn't." 12 RP at 54.

In the other statement, the prosecutor told the jury during rebuttal, "If a witness were bought and paid for, wouldn't his testimony have been a little bit better? If this was really a situation of say what we want you to say, wouldn't he have said, I actually saw Abraham shoot the gun? He didn't say that. Because he didn't see it. He testified to what he knew, no more, no less." 12 RP at 162.

"It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness. However, prosecutors have wide latitude to argue reasonable inferences from the facts concerning witness credibility, and prejudicial error will not be found unless it is

clear and unmistakable." *State v. Allen*, 176 Wn.2d 611, 631, 294 P.3d 679 (2013).

Improper vouching occurs when the prosecutor expresses his personal belief in the

veracity of the witness or indicates that evidence not presented at trial supports the

testimony of the witness. *Thorgerson*, 172 Wn.2d at 443.

"Remarks of the prosecutor, even if they are improper, are not grounds for reversal

if they were invited or provoked by defense counsel and are in reply to his or her acts and

statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative

instruction would be ineffective." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747

(1994). A prosecutor can argue that the evidence does not support the defense theory and

is entitled to make a fair response to defense arguments. *Id.* at 87.

In *Russell*, a constant theme in the defendant's case was that the police had

inadequately investigated the charged murders. *Id.* In response, the State argued that

further investigation was offered to and rejected by the defense and, therefore, some

incriminating evidence may not have been developed. *Id.* The court held the State's

argument was a fair response to defense criticisms. *Id.* Furthermore, any impropriety

was ameliorated by a curative instruction. *Id.*

In considering Benjamin's first credibility challenge, we conclude that the

prosecutor went outside the evidence in the case when he stated that Mr. Hernandez could

32

not make up his account of the shooting because he was not smart enough. In our review of the record, there is no evidence regarding Mr. Hernandez's mental capacity or his ability to make up a story. The prosecutor bolstered Mr. Hernandez's credibility by giving an unsupported reason as to why he was telling the truth. While we find this statement improper, any minimal prejudicial effect could have been cured by a limiting instruction.

We reject the remainder of Benjamin's contentions that the prosecutor improperly vouched for the credibility of Mr. Hernandez. The challenged statements did not imply that the prosecutor personally believed Mr. Hernandez. Like in *Russell*, it was proper for the prosecutor to rebut defense argument and say that if Mr. Hernandez was lying, then he clearly would have made up a better story and that he needed to tell the truth so his story would not be disproven. Both Abraham and Benjamin attempted to discredit Mr. Hernandez by contending that he was lying, that he took the deal from the State to avoid prosecution, and that he was simply saying what the prosecutor wanted to hear. The State had wide latitude to respond to this argument. The State responded by arguing that Mr. Hernandez's story did not provide the level of incriminatory evidence that the State would have liked to present if it were a lie. The argument merely responded to the defense's argument that Mr. Hernandez was not telling the truth.

33

Furthermore, the prosecutor did not imply that he personally believed Mr. Hernandez when he told the jury that Mr. Hernandez risked his life to tell the truth. The prosecutor argued, "At first, he was reluctant to talk. And he told you why on the stand. He said he didn't want to testify against these two guys. He felt concern for his safety." 12 RP at 53. The prosecutor was restating the testimony of Mr. Hernandez and not implying his personal belief.

5. *Misstatement of the burden of proof.* Benjamin contends that the prosecutor lowered the burden of proof for accomplice liability by telling the jury that Benjamin was ready to assist in the crime because it was his obligation as a gang member. In describing the events on the night of the murder, the State argued, "Now, while this was going on, the other three Surenos, two of them Marijuanos 13 members, were in the car with another gun, ready to assist, if necessary. Of course, they were ready to assist, that is their obligation as a fellow gang member. That is his obligation as a brother." 12 RP at 49.

In the State's rebuttal argument, the prosecutor said,

> You heard Mr. Crowley say that [Mr.] Hernandez is guilty as an accomplice. And you know the driver also is also guilty, as well. Now, what did Mr. Hernandez do that makes him guilty as an accomplice, according to Mr. Crowley? He had the motive, right? They were all in the same gang, they all lost a friend. He had the opportunity, he was there, as well, just like [the defendants]. And arguably had the ability, because he was there with the gun, or the group was there with the gun.

34

But it cuts both ways. Because if Mr. Hernandez is guilty, as they say, for simply being there, these two are in the exact same boat. If Mr. Hernandez is guilty as they say, and he's getting the benefit of a deal, that may be true, but what that tells you is their clients are guilty and they have just told you that. As a matter of law, they have told you their clients are at a minimum accomplices to this murder.

12 RP at 159. Abraham's attorney objected to these statements on the grounds that Benjamin's counsel had not made the alleged statements. The court overruled the objection as argument. Benjamin maintains that these statements imply that he could be found guilty as a matter of law for simply being at the scene of the crime, which is insufficient to prove accomplice liability.

A defendant's presence at the scene of a crime is not enough to prove accomplice liability, even if the defendant is fully aware of the ongoing criminal activity. *In re Welfare of Wilson*, 91 Wn.2d 487, 491-92, 588 P.2d 1161 (1979) (quoting *State v. J-R Distribs., Inc.*, 82 Wn.2d 584, 593, 512 P.2d 1049 (1973)). The accused's presence at the scene is sufficient only if the jury also finds that the defendant was present at the scene and was ready to assist. *Id.* at 491. To prove that a defendant is ready to assist, the State must be able to point to specific facts that tend to show that the defendant's presence at the scene indicated that he was also ready to assist with the commission of the crime. *State v. Collins*, 76 Wn. App. 496, 502, 886 P.2d 243 (1995).

35

The first challenged argument is not improper. The prosecutor did not reduce the burden of proof for accomplice liability. Benjamin takes the prosecutor's argument out of context. The prosecutor did not say that mere presence was enough. To the contrary, he argued that Abraham and Benjamin were ready to assist. The right standard is also found in the jury instructions. Jury members are presumed to follow court instructions. *Thorgerson*, 172 Wn.2d at 444.

Furthermore, the argument is supported by the record. Mr. Hernandez testified that gang members were expected to have everyone's back, inferring that gang members have an obligation to assist others. Specifically, Mr. Hernandez testified that Benjamin gave driving directions and the men ended up at Mr. Beltran's home, and that Abraham left the car at the time of the shooting. Based on this evidence the prosecutor could argue that they were in the car to assist. The argument was not improper.

Benjamin also maintains that the prosecutor misstated his argument to imply that his attorney admitted his client's guilt. He contends that he was prejudiced by this misstatement because it led the jury to believe that defense counsel admitted his client's guilt as an accomplice, and the court's decision to overrule his objection added an aura of reliability to the misstatement.

The trial court correctly determined that the rebuttal statements were argument. Defense counsel in closing argued that the evidence connected Mr. Hernandez to the crime. Counsel maintained that the facts showed Mr. Hernandez was involved in the murder but was not being held accountable because of his deal with the State. Defense also argued that the same evidence that linked Benjamin to the crime linked Mr. Hernandez.

> Remember [the prosecutor] spent a great deal of time talking about all the motive and he assured you he would go through his list of evidence, and the litany of evidence that he had against Benjamin indicating motive. He told you he would demonstrate all the motive. But if the motive applies to him, the motive applied to him. It works the same way. He was in a gang, he was in a gang. He wanted to advance, no, he wanted to advance. Where is the proof? The proof is with me. I am lying to you. My name is [Mr. Hernandez]. I don't want to go to prison.

12 RP at 124. The prosecutor's argument was an extension of defense counsel's argument that Mr. Hernandez and Benjamin had equal motive. It did not imply that the defense attorney thought his client was guilty. The prosecutor's statement was argument and was not improper.

6. *Step into shoes*. Benjamin contends that the prosecutor committed misconduct by encouraging the jury to step into the shoes of Benjamin and speculate as to his state of mind. The prosecutor argued,

37

And every time you see his house, it's going to be a reminder of how the rival gang killed your friend.

Think of how that would affect a 16-year-old or 17-year-old young man's mind, gang member's mind. Every day he wants to go get a slice of pizza and he has to be reminded about the rival gang member that murdered his friend. That's a powerful motivator. Gang members have a duty to back up their friends. They've lost a fellow gang member, and they had a duty to do something about it.

. . . .

Now, go back to that motive issue just briefly. Think about what that must have been like for these young men to believe 18th Street killed their friend, and here is one of their leaders on the main street in town for everyone to see wearing his colors, full display. Folks, that would probably drive anyone over the edge.

12 RP at 39-40, 42. Benjamin contends that through these statements, the prosecutor testified to Benjamin's thought processes, argued facts not in the evidence, and tried to inflame the jury's passions and prejudices.

Statements that do no more than appeal to the passion or prejudice of the jury are improper. *Pierce*, 169 Wn. App. at 552 (quoting *State v. Gregory*, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006)). It is reversible error for a prosecutor to urge a jury to decide a case based on evidence outside the record. *Pierce*, 169 Wn. App. at 553. Prosecutors often use matters outside the record to appeal to a jury's passion; thus, the two rules are closely related. *Id.* It is improper for a prosecutor to step into the shoes of a defendant and represent his thought processes when those facts are not in evidence. *Id.* at 554.

38

In *Pierce*, the prosecutor stepped into the shoes of the defendant during closing arguments by repeatedly presenting the thought process of the defendant from the first person point of view. *Id.* at 553-54. He argued from the defendant's point of view, "'But who do I know in Quilcene that has money? Well, the Yarrs. I know they got money. And they have cash, because they paid me in cash. I can go up there and get some money. But there's one problem: I don't want to work for it. . . . He's not going to give it to me, so I need a gun, but I don't know anybody that has a gun.'" *Id.* at 542. The court found that these statements were calculated to portray the defendant as an impatient, amoral drug addict who refused to work. *Id.* at 554. While the court found that the prosecutor could have asked the jury to infer this view from the facts, the court held that the prosecutor went beyond his wide latitude in drawing inferences from the evidence by effectively testifying about the particular thoughts the defendant must have had in his head, outside of the evidence. *Id.* at 555. The court held that the cumulative effect of this and other improper statements objected to by the defendant affected the jury verdict because the statements focused on the shocking nature of the crimes and invited the jury to imagine the crimes happening to themselves. *Id.* at 556.

Here, while the prosecutor's statements peer into the minds of Abraham and Benjamin, the prosecutor's statements do not rise to the level of impropriety as in *Pierce*.

39

Much of the argument is supported by the evidence and did not require speculation. Mr. Hernandez testified that Mr. Davalos's death made Abraham and Benjamin mad. Deputy Harris and Mr. Hernandez testified about a gang member's duty to retaliate. Benjamin testified that two of the people in the car became tense upon seeing Mr. Beltran. The inferences in the argument were based on the evidence and supported the motive advanced by the State. Even if improper, Benjamin fails to establish that these statements could not have been cured by a limiting instruction. The statements were not shocking or repetitive to the extent that they affected the jury's verdict.

7. *Guilt by association.* Benjamin contends that the prosecutor committed misconduct when he implied that the jury should convict Benjamin as an accomplice because his brother was guilty. The prosecutor implied guilt by association by arguing that a fellow gang member has an obligation to help. Additionally, the prosecutor said, "[Benjamin and Abraham] wear almost identical clothing. . . . Now, a lot of people have brothers, a lot of people like their brothers. But it's pretty rare for brothers to be so close that they wear almost identical outfits. That's a very, very deep bond, and that is a mirroring or copying of a younger brother and an older brother." 12 RP at 50. Benjamin maintains that by making this statement, the prosecutor improperly assumed that the

40

brothers wore the same style of clothing because of their bond, and that they would lie and kill for each other.

This statement is not improper because it does not imply that Benjamin was guilty because of his relationship with his brother or because they wore the same style of clothing. Instead, the statement supports the State's theory that the brothers would do anything for each other, including murder. The prosecutor attempts to show motive by referencing evidence that proved the close relationship. This statement by the prosecutor does not imply that the jury could forgo the instructions on accomplice liability and convict because of the relationship.

8. *Disparaging defense counsel.* As another example of misconduct, Benjamin contends that the prosecutor disparaged defense counsel by insinuating that defense counsel believed his client was guilty. The prosecutor discussed the powerful effect of Mr. Hernandez's testimony in his rebuttal argument, stating, "[Defense counsel] called [Mr. Hernandez] a liar 20 times. You can tell where an attorney is concerned about a case based upon what they focus on. They are scared to death of the testimony of [Mr.] Hernandez. Because it is the truth, it is consistent, it is corroborated by other witnesses and other facts. They don't want you to believe him, because they know what it means." 12 RP at 160-61. Benjamin also contends that through this statement, the prosecutor

41

referenced facts about counsel's opinion that were not in the record and improperly

bolstered Mr. Hernandez's credibility by saying his testimony was the truth.

A prosecutor cannot make disparaging comments about defense counsel's role or

impugn defense counsel's integrity. *Thorgerson*, 172 Wn.2d at 451. However, it is not

improper for a prosecutor to argue that the evidence does not support the defense theory

of the case. *Russell*, 125 Wn.2d at 87. "Moreover, the prosecutor, as an advocate, is

entitled to make a fair response to the arguments of defense counsel." *Id.*

Discrediting Mr. Hernandez was crucial to the defense of Benjamin. It is true that

defense counsel repeatedly referred to Mr. Hernandez as a liar. The prosecutor was

permitted to respond to defense arguments. He also was permitted to show that consistent

evidence from other witnesses discredited defense arguments that Mr. Hernandez was

lying. Nothing in these arguments impugn defense counsel's role or integrity.

9. *Unable to walk down the street.* Benjamin contends that the prosecutor argued

facts not in the record during rebuttal when he said,

> Now, that may be true that [Mr.] Hernandez isn't going to go to
> prison for this. But that's not all he gets. Let's be right up front about this.
> He gets to never, ever walk down the streets in the city of Quincy again.
> Ever. He doesn't get to go to a movie theater or a pizza parlor in Quincy or
> probably Ephrata or Moses Lake. He doesn't get to do those things
> because, as they have testified, as evidence has shown, if you testify against
> one of these guys, there's going to be a mark out on you. That's pretty
> powerful disincentive to testify. You don't do that.

42

12 RP at 162-63. Benjamin contends that the prosecutor stepped far beyond the permissible limit of inferring facts from the record and appealed to the prejudices of the jury.

It is reversible error for a prosecutor to urge a jury to decide a case based on evidence outside the record. *Pierce*, 169 Wn. App. at 553.

Benjamin is correct that there is no direct evidence in the record about what Mr. Hernandez will be able to do now that he testified at the trial of a gang member. However, the prosecutor's statements here are reasonable inferences from the record designed to contradict the defense closing argument that Mr. Hernandez would not suffer any consequences from his actions. Defense counsel argued during closing that Mr. Hernandez got his life back in exchange for giving two hours of testimony at trial. On rebuttal, the prosecutor responded by arguing that Mr. Hernandez did not get his life back by testifying. Testimony at trial established that members who testify against other gang members are beaten or killed. From this the prosecutor presented examples of how Mr. Hernandez's life would be limited.

Benjamin contends that even if no individual error warrants reversal, cumulative error denied him a fair trial. Errors that do not individually require reversal may still require reversal if together they violate a defendant's right to a fair trial. *State v. Jackson*,

43

No. 31441-3-III
*State v. Lopez*

150 Wn. App. 877, 889, 209 P.3d 553 (2009). In this situation, there are not multiple errors of prosecutorial misconduct. Accordingly, cumulative error does not apply.

Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, J.

Fearing, J.

44